In re B.S. LIVINGSTON
& CO., INC., Debtor.

Robert GIBBONS, et al., Plaintiffs,

v.

STEMCOR USA, INC., et al., Defendants.

Civ. A. No. 94–3535 (MTB).
Bankruptcy No. 92–20480G.
Adv. No. 93–2301.

United States District Court,
D. New Jersey.

Aug. 23, 1995.

Myron S. Lehman, Lehman, Lehman & Gruber, Livingston, NJ, for appellants.

William S. Katchen, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, Robert J. Stickles, Carpenter, Bennett & Morrissey, Newark, NJ, for appellees.

BARRY, District Judge.

At the heart of this adversary complaint is a very substantial allegation that the former principals of the debtor corporation orchestrated a blatant fraudulent conveyance several months prior to the filing of a bankruptcy petition. As a result, the complaint alleges, several banks, who were secured creditors to the tune of millions of dollars, were left with little more than the empty husk of the debtor from which to recoup their losses.

## I. STATEMENT OF FACTS

B.S. Livingston & Co., Inc., the debtor, was a steel trading middleman business. Alfred Schnog, Anita Schnog and Albert Ouaknine (hereinafter "the BSL principals" or "appellants") were the primary shareholders and officers of B.S. Livingston. To purchase the considerable quantities of steel required by the business, B.S. Livingston needed large amounts of capital. To this end, it negotiated with a group of banks to create a significant line of credit. This group included Chase Manhattan, N.A. (the lead bank), National Westminster Bank, U.S.A., Chemical Bank (the successor in interest to Manufacturers Hanover), and Fidelity Bank, N.A. (hereinafter "the Banks" or "appellees").[1]

---

1. Fidelity withdrew its line of credit in 1989. B.S. Livingston thereafter received, for a short while, a $15 million dollar line of credit from Standard Chartered Bank ("SCB"). SCB was never allowed to join the pre-existing intercreditor agreement between the Banks, however, because SCB would not agree to allow its line of credit to be used by B.S. Livingston to pay off its debt to Fidelity or to the other Banks. SCB soon reduced its line of credit to $5 million and would

While the Banks had previously extended loans to B.S. Livingston pursuant to an intercreditor agreement, a further credit agreement governing the terms of the loans extended to B.S. Livingston by the Banks was executed on August 1, 1990. *Appellees' Brief*, at 4.[2] In exchange for the loans, B.S. Livingston executed promissory notes in the amount of $4.9 million to each Bank. *Id.* These notes were secured by previously executed security agreements granting the Banks security interests in substantially all of B.S. Livingston's personal property then existing and thereafter acquired general intangibles. *Id.*, at 4–5.

During 1990 and 1991, B.S. Livingston's financial condition continued to deteriorate. The BSL principals attempted to find potential purchasers for the company, but ultimately concluded that liquidation was the only avenue available to them. *Appellants' Brief*, at 6. To this end, Alfred Schnog met with Mark Harrison of Chase on May 31, 1991. The BSL principals allege that at this meeting, Mr. Schnog informed Mr. Harrison that (1) Standard Chartered Bank had elected not to proceed with financing; (2) the BSL principals had been unable to find a purchaser of the entire enterprise; (3) liquidation was the only available avenue; and (4) the BSL principals were in negotiations with several prospective buyers, including Stemcor, a British company. *Id.* Mr. Schnog alleges that Mr. Harrison gave him some encouragement by stating that he thought that the BSL principals were doing "just the right thing." *Id.*

This meeting was followed by Mr. Schnog's June 13, 1991 letter to Thomas Cassin of Chase in which Mr. Schnog informed Mr. Cassin that he had reached an advanced stage of negotiations with one potential buyer of the core business, i.e. Stemcor. *Id.*, at 7. Mr. Schnog concedes that Mr. Cassin sent him a letter dated June 18, 1991 in which Mr. Cassin stated that he viewed B.S. Livingston as being in default and requested projections of the liquidation, but emphasizes that Mr. Cassin also stated his support for the repayment of B.S. Livingston's loan obligations through an orderly liquidation.[3]

By agreement dated September 16, 1991, the BSL principals agreed to sell the core of the BSL business to Stemcor. The transaction was memorialized in four documents. (Exhibits N through Q to the Schnog Affidavit). It appears that the only compensation B.S. Livingston received was $800,000 for its inventory, with the remainder of the compensation going to the BSL principals who were provided with lucrative positions in Stemcor's newly-formed BSL division. The principals' compensation was in part tied to the profitability of this new division. *See Schnog Affidavit*, Exhibit N. By an amendment to the agreement, the BSL principals were allowed to continue working for B.S. Livingston. *Id.*, Exhibit O. Furthermore, Stemcor was granted a license to use the B.S. Livingston name. *Id.*, Exhibit P.[4]

Apparently, the Banks first learned that the Stemcor transaction had occurred at a meeting between the Schnogs and representatives of Chase, Manufacturers Hanover and NatWest on September 23, 1991. The BSL principals claim that no objection was voiced at that meeting. *Appellants' Brief*, at 9. They admit, however, that by letter dated September 25, 1991, Chase objected to the transaction and requested, without waiving any right to claim a default, that the BSL

only agree to provide back-to-back letter of credit financing, thus increasing the financial pressures already bearing down upon B.S. Livingston. *Appellants' Brief*, at 5.

2. For purposes of these background facts, the court will cite to the briefs of the parties given that there appears to be no relevant dispute as to the underlying terms of the agreements.

3. Based primarily upon the May 31, 1991 meeting and this subsequent exchange of letters, the BSL principals argue that the Banks lulled them into believing that the Banks approved of the Stemcor deal. This forms the basis of the BSL principals' argument that the Banks should be estopped from contesting the Stemcor transaction as a fraudulent conveyance.

4. This agreement is critical to the issue of subject matter jurisdiction. The key question is whether the lifting of the automatic stay stripped the estate of any interest in the assets that were subject to the stay. The right to use the B.S. Livingston tradename was not explicitly subject to the stay relief order (or the related stipulation that the estate had no interest in the assets).

principals supply the Banks with more information to monitor the liquidation. *Id.,* at 9–10. By letter dated November 8, 1991, the Banks informed the BSL principals that certain events of default had occurred, and that the transfer to Stemcor was "unauthorized". *Id.,* at 10. By letter dated November 26, 1991, the Banks reiterated that they believed that certain events of default had occurred, rendering the entire outstanding debt owed by B.S. Livingston due and payable to the Banks. *Id.,* at 11. Once again, the Banks proposed to forebear from pursuing their remedies if the BSL principals supplied more information to the Banks and signed an agreement to repay the indebtedness by a weekly sweep mechanism. *Id.* The BSL principals agreed to do so. *Id.*

On January 22, 1992, B.S. Livingston filed a Chapter 11 petition. By order of the bankruptcy court dated March 2, 1992, the Chapter 11 proceedings was converted into a Chapter 7 proceeding with Robert Gibbons remaining as Trustee. *Appellees' Brief,* at 5.

By order dated April 6, 1992, the Banks were granted relief from the automatic stay to pursue their rights and remedies to the inventory and accounts receivable. *Id.,* at 6. *See Schnog Affidavit,* Exhibit V. This order also contained a reference to a stipulation "that the Debtor does not have any equity in the inventory and accounts receivable, and that this collateral is not necessary to an effective reorganization of the Debtor's estate", and further stated that "said inventory and accounts receivable shall be immediately surrendered to the possession and control of the Banks to liquidate said collateral in a commercially reasonable manner." *Id.,* at 3. On November 13, 1992, the bankruptcy court issued an "Order Clarifying Order Dated April 6, 1992". This order, which was submitted by the Banks' attorneys and signed by the bankruptcy judge without alteration, "clarified" the earlier order so as to "make clear that the Trustee pursuant to the April 6, 1992 order remains the holder of title to all of the debtor's accounts receivable, causes of action, general and other intangibles, subject to the valid perfected liens and security interest in that property in favor of the Banks." *See Certification of Gary F. Eisenberg,* Exhibit N.

The adversary complaint now before this court was filed in the pending bankruptcy action on May 21, 1993. At the heart of the complaint is the allegation that the Stemcor transaction constituted a fraudulent conveyance. Spinning off this central claim (which is embodied in Counts 1 through 3 of the complaint) are claims for conversion (Count 4), tortious interference with contractual relations (Count 5), tortious interference with economic advantage (Count 6), conspiracy (Count 7), breach of the duty of loyalty (Count 8), and successor liability (Count 9). On September 30, 1993, the BSL principals filed a motion to dismiss the complaint in its entirety alleging lack of subject matter jurisdiction; the related grounds of estoppel, waiver and laches; and, alternatively, requesting abstention. Also in the alternative, the BSL principals moved for dismissal or summary judgment on each and every count of the complaint in which they were named.

By opinion dated May 25, 1994 and order dated June 21, 1994, the bankruptcy court denied the BSL principals' motions. Unfortunately for this court, the BSL principals timely filed their notice of appeal on July 1, 1994.

## II. STANDARD OF REVIEW

As a preliminary matter, this court notes that a district court sitting in its appellate role may only disturb factual findings of the bankruptcy court if they are clearly erroneous. *See* Bankr.R. 8013; *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.,* 891 F.2d 66, 69 (3d Cir.1989). The bankruptcy court's legal findings, however, are subject to plenary review. *Id.; Matter of Glen Properties,* 168 B.R. 537, 538 (D.N.J.1993). When reviewing a matter which is committed to the discretion of the bankruptcy court, the district court may only determine whether or not the bankruptcy court abused its discretion. *Id.; see also, In re Vertientes, Ltd.,* 845 F.2d 57, 59 (3d Cir.1988).

## III. JURISDICTIONAL ISSUES

Appellees first attempt to short circuit the BSL principals' appeal by challenging the

appellate jurisdiction of this court.[5] Inasmuch as the question of appellate jurisdiction is inextricably intertwined with the question of subject matter jurisdiction, the two issues will be discussed together.

## A. *Appellate Jurisdiction*

To begin with, a district court may hear an appeal from the bankruptcy court if the order appealed from is a "final order" creating an appeal by right, or if the order, although not final, meets certain conditions that enable the district court to entertain it as an interlocutory appeal. Under one particularly expansive Third Circuit decision, the bankruptcy court's order may in fact qualify as a final order. Even if it does not, however, this court is empowered to entertain this appeal as an interlocutory appeal if it implicates "a controlling question of law as to which there is substantial ground for difference of opinion and ... an immediate appeal ... may materially advance the ultimate termination of the litigation ...". *In re Bertoli*, 58 B.R. 992, 995 (D.N.J.1986), *aff'd*, 812 F.2d 136 (3d Cir. 1987).

### 1. Did the Bankruptcy Court's Order Represent a "Final Order" for the Purposes of Appellate Jurisdiction?

■ As an initial matter, the "unique characteristics of bankruptcy have led [the courts] to 'consistently consider finality in a more pragmatic and less technical way in bankruptcy cases than in other situations.'" *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 103 (3d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988) (quoting *In re Amatex Corp.*, 755 F.2d 1034, 1039 (3d Cir.1985)). However, a denial of a motion to dismiss by the bankruptcy court is generally not considered to be a "final order". *See In the Matter of Greene Cty. Hosp.*, 835 F.2d 589, 596 (5th Cir.), *cert. denied*, 488 U.S. 820, 109 S.Ct. 64, 102 L.Ed.2d 41 (1988) (quoting *In re County Management*, 788 F.2d 311, 313–314, n. 3 (5th Cir.1986) (denial of motion

to dismiss for lack of subject matter jurisdiction not a final order)).

Nonetheless, under Third Circuit precedent, the order in this case may qualify as a "final order" even though it denied a motion to dismiss and/or for summary judgment. In *Matter of Christian*, 804 F.2d 46 (3d Cir. 1986), the court considered whether the denial of a motion to dismiss a Chapter 7 petition brought by a creditor bank was a "final order". While implicitly acknowledging that such an order did not constitute a "final order" in the traditional sense, the *Christian* court nonetheless invoked the pragmatic approach that should be followed in determining finality in bankruptcy cases, following the lead of *Matter of Marin Motor Oil*, 689 F.2d 445 (3d Cir.1982), *cert. denied*, 459 U.S. 1207, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983), and *In re Comer*, 716 F.2d 168 (3d Cir.1983). In holding that it could entertain the appeal of the denial of the motion to dismiss a Chapter 7 petition, the *Christian* court reasoned as follows, reasoning which is particularly relevant to the jurisdictional issue before this court:

> If the order here is not now appealable the entire bankruptcy proceedings must be completed before it can be determined whether they were proper in the first place. We do not view such a resolution as either desirable or practical. In light of *Marin Motor Oil*, *Comer*, and *Amatex*, we therefore conclude that the district court's order in this case is a final order under § 158(d).

804 F.2d at 48.

This rationale is particularly apt here where this court is faced with the prospect of conducting a trial on the underlying allegations. The critical question presented by this appeal is whether this court has subject matter jurisdiction over the adversary complaint. It would seem extraordinarily impractical to await the outcome of this litigation on the merits [6] before determining that

---

5. Appellees appeared less anxious to press this point at oral argument. This court, however, must nonetheless scrutinize its appellate jurisdiction.

6. This case is currently in a rather unusual procedural posture before this court. After the bankruptcy court issued its opinion and order denying the motions to dismiss and/or for summary judgment, the reference to the bankruptcy court was withdrawn. Thus, currently before

issue. Accordingly, this court holds that, under the reasoning of the *Matter of Christian* court, the order denying the motion to dismiss and/or for summary judgment represents a "final order" over which this court may exercise appellate jurisdiction.

### 2. Assuming that the Bankruptcy Court's Order did not Represent a "Final Order", does this Court have Appellate Jurisdiction over the Interlocutory Appeal?

█ Even if the denial of the motion to dismiss and/or for summary judgment is not a "final order," this court is not necessarily foreclosed from exercising jurisdiction over the appeal. A district court is permitted to hear an interlocutory appeal if the conditions of 28 U.S.C. § 1292(b) are met, i.e., if the order below "involves a controlling question of law as to which there is a substantial ground for difference of opinion and ... an immediate appeal ... may materially advance the ultimate termination of the litigation ...". *In re Bertoli*, 58 B.R. at 995. *See also, Matter of Ichinose*, 946 F.2d 1169, 1177 (5th Cir.1991); *In re National Office Products, Inc.*, 116 B.R. 19, 21 (D.R.I.1990); *In re Auto Dealer Services, Inc.*, 81 B.R. 94, 96 (M.D.Fla.1987).

The instant case, as will be described in detail as this opinion proceeds, would satisfy these requirements assuming that the bankruptcy court's reliance upon *Maislin Industries, U.S., Inc. v. A.J. Hollander*, 69 B.R. 771 (E.D.Mich.1986), as a basis for finding that it was vested with subject matter jurisdiction was well-founded—or some other controlling question of law is apparent. Appellees, of course, make the blanket statement that "no substantial grounds for difference of opinion exist as to controlling questions of law". *Appellees' Brief*, at 2. But as presented by the parties—particularly in their written submissions—this appeal involves a very real legal and possibly outcome-determina-

tive dispute concerning whether the lifting of the automatic stay stripped the bankruptcy court of subject matter jurisdiction over the claims raised by the Banks. Further, the parties hotly and legitimately dispute the legal standard which should have been applied below, with appellees relying on *Maislin*, and the BSL principals relying upon *In re Incor*, 100 B.R. 790 (Bankr.D.Md.1989), *aff'd* 113 B.R. 212 (D.Md.1990). These cases could, as a matter of law, lead to differing conclusions as to the proper legal rule to be applied, and could well affect the outcome of this litigation. This seemingly simple conclusion, however, has only been reached after an extensive review of the authorities that relate to the jurisdictional effects of a grant of relief from the automatic stay, a review set forth at length immediately following this section. What this review will also indicate is that even if the conflict between *Maislin* and *Incor* is, under the facts of this case, more imagined than real, a difficult—and controlling—legal issue remains.

Thus, assuming a controlling question of law over which there is a legitimate difference of opinion has been identified, the question becomes whether allowing the instant appeal to go forward would advance the ultimate termination of the litigation. While certainly the length of time it has taken for the host of motions to wend their way through the bankruptcy court and thereafter on appeal to this court has done anything but advance the ultimate termination of the litigation, hearing the appeal may help lead to a speedier conclusion. Certainly, if the bankruptcy court lacked subject matter jurisdiction, it is far better to know that now, rather than after a trial in this matter.

█ One issue remains, however, before this court may entertain the appeal. Succinctly put, may this court convert appellants' notice of appeal into a motion for leave to appeal? Bankruptcy Rule 8003(c) demon-

this court is the appeal from that opinion and order as well as the actual case itself. Accordingly, it is certainly possible that if this court does not address the subject matter jurisdiction issue now—and that issue has only been presented to this court in the context of the appeal—a trial could be concluded only to be rendered a

nullity by this court's subsequent finding that it lacked subject matter jurisdiction to conduct the trial in the first place. Such a possibility amply justifies the invocation of the *Matter of Christian* court's reasoning to deem the bankruptcy court's order a "final order."

strates that this court should apply a rule of "procedural clemency":

> If a required motion for leave to appeal is not filed, but a notice of appeal is timely filed, the district court or bankruptcy appellate panel may grant leave to appeal or direct that a motion for leave to appeal be filed. The district court or the bankruptcy appellate panel may also deny leave to appeal but in so doing shall consider the notice of appeal as a motion for leave to appeal.

See *In re American Freight System, Inc.*, 153 B.R. 316, 319 (D.Kan.1993); *In re Bowers–Siemon Chemicals Co.*, 123 B.R. 821, 824 (N.D.Ill.1991). Thus, the BSL principals need only have filed a timely notice of appeal to preserve their right to seek leave of the court to file an interlocutory appeal. *See Bowers–Siemon*, 123 B.R. at 824 (citing *In re Leibinger–Roberts, Inc.*, 92 B.R. 570, 573 (E.D.N.Y.1988). They have done so.

Accordingly, and wholly aside from whether *Matter of Christian* would in and of itself countenance an appeal, this court will treat the notice of appeal as a motion for leave to file an interlocutory appeal and will grant that motion.

## B. *Subject Matter Jurisdiction*

As alluded to earlier, the appellate jurisdiction of this court—assuming that this court is presented with an interlocutory appeal and not an appeal from a final order—is inextricably intertwined with the question of subject matter jurisdiction. Essentially, the issue of whether this court has subject matter jurisdiction boils down to whether the lifting of the automatic stay in this case stripped the bankruptcy court of subject matter jurisdiction over the adversary complaint. To conclude that it has appellate jurisdiction over an interlocutory appeal, this court must be satisfied that there are conflicting authorities concerning the effect of the lifting of the automatic stay that are relevant to this case. Without question, as will be set forth in detail, *Maislin* and *Incor* present conflicting rules as to the effect of the lifting of the automatic stay. The only issue, then, is whether the holding in either of these cases would lead to a conclusion that

the bankruptcy court—and now this court in light of the withdrawal of the reference—had subject matter jurisdiction over the adversary complaint after relief from the automatic stay had been granted.

### 1. The Bankruptcy Court's Opinion and Order

■ The most critical and most difficult issue before this court concerns whether the bankruptcy court had subject matter jurisdiction over the claims contained in the adversary complaint after the automatic stay was lifted. The BSL principals assert that these claims do not constitute either "core proceedings" or "non-core proceedings" over which the bankruptcy court had subject matter jurisdiction. Conversely, appellees assert that their claims represent "core proceedings" or, at a minimum, "non-core proceedings" "related to" the bankruptcy case.

The bankruptcy court held that the Trustee's cause of action based on a claim of fraudulent conveyance under 11 U.S.C. § 548 fell within § 157(B)(2)(H) and, thus, was a "core proceeding". *Opinion*, at 30. The Banks' various claims, however, including their claims for fraudulent conveyance, were determined to more appropriately fall under the bankruptcy court's "related to" jurisdiction as "non-core" claims because they could have been raised in an action outside of a bankruptcy proceeding. *Id.* Thus, the bankruptcy court determined that it had jurisdiction over all the claims of the adversary complaint.

The fundamental determination to be made, however, is not whether the claims of the Trustee and/or the Banks are "core" or "non-core" but, rather, whether B.S. Livingston retained any interest in the assets of the estate in the wake of the April 6, 1992 Stay Relief Order. If so, the Trustee would have a valid "core" claim and there would be jurisdiction over "non-core" claims if those claims were "related to" the bankruptcy proceeding.

The BSL principals argue that the Trustee's fraudulent conveyance claim does not constitute a "core proceeding" because the debtor no longer had any interest in the assets at issue "by virtue of the order grant-

ing relief from the automatic stay." *BSL Appellants' Brief,* at 21–22.[7] Thus, the argument goes, all actions related to the recovery of the property (and the undoing of the Stemcor transaction) have no relation to the bankruptcy proceeding, and the bankruptcy court could not have exercised subject matter jurisdiction over any claim contained within the adversary complaint.

In response, appellees contend that the Trustee retains a viable fraudulent conveyance claim even after the April 6, 1992 Stay Relief Order. If the Trustee retains such a claim, of course, that claim is clearly "core"; the issue, however, is whether that claim survives.

In support of their contention that the Trustee still has a viable claim, appellees stress that even if the Stay Relief Order signaled something akin to an abandonment as to the property that was the subject of that order, i.e., inventory and accounts receivable, which they argue it did not, it did not apply to *general intangibles* belonging to the debtor's estate such as the right of the debtor to its tradename[8] or the right to recover for torts committed against the debtor, including the right to recover on the claim of successor liability. Failing that, appellees point to the November 13, 1992 "Order Clarifying Order Dated April 6, 1992" which they claim "clarifies" that the Trustee retained title and, thus, an interest even in the inventory and accounts receivable that were subject to the April 6 Order. In other words, appellees argue, by virtue of this "Clarifying Order" the Trustee retained title to all inventory, accounts receivable, and general intangibles not yet turned over to the Banks. *Id.* Thus, they contend that the Trustee has a

valid "core" claim even as to those assets which the Banks are free to pursue. To bolster this claim, appellees note that the Trustee has remained active in prosecuting various causes of action to collect numerous accounts receivable and that he deducts his expenses from these amounts before turning over the proceeds to the Banks. *Id.,* at 20–21.

Thus, appellees present two layers of defense to the charge that the bankruptcy court lacked subject matter jurisdiction over the adversary complaint. First, they argue that as the stay was never lifted as to any claim encompassing a general intangible or to any proceeds that would be generated by an award on the successor liability claim, the debtor retains an interest in those assets and, thus, the Trustee has a "core" claim. Second, appellees argue that the lifting of the automatic stay did not serve to eradicate the estate's interest even in the assets subject thereto. To this end, appellees rely upon the decision in *Maislin* and upon the November 13, 1992 "Clarifying Order". Appellants, in turn, minimize the general intangible and successor liability claims and argue that the lifting of the automatic stay effected an abandonment of the property, forever divesting the debtor of any interest in the only real property that had belonged to the estate. In support of this latter argument, appellants rely upon *Incor.*

The question of whether *Maislin* or *Incor* applies may prove decisive because the bankruptcy court could only exercise jurisdiction over the Banks' claims if they are non-core proceedings that are "related to a case under title 11". 11 U.S.C. § 157(c)(1). In *Pacor,*

---

**7.** The BSL principals impliedly concede that but for the debtor's supposed relinquishing of an interest in the assets via the relief from the automatic stay, the Trustee's fraudulent transfer claim would constitute a "core proceeding" under 28 U.S.C. § 157(b)(2)(H) ("Core proceedings include, but are not limited to ... (H) proceedings to determine, avoid, or recover fraudulent conveyances").

**8.** At the closing of the Stemcor transaction, the BSL principals and Stemcor executed a document granting a license to Stemcor to use the BSL name for a five-year period. *See Affidavit of Alfred Schnog dated September 30, 1993,* Exhibit P. Apparently, nothing in the April 6th Stay

Relief Order related to this "general intangible." Appellants state that "[i]t is undisputed, however, that Stemcor has offered to surrender to the trustee the right to use the BSL trade name" and, accordingly, conclude that appellees' tradename argument is "nothing more than a red herring." *Appellees' Reply Brief,* at 6. At oral argument, appellees suggested that the use of the tradename by Stemcor and appellants has generated considerable income which appellants have not offered to relinquish. Neither side has provided any authority relevant to the jurisdictional implications of the right to a tradename or the offer to surrender its use.

*Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984), the Third Circuit stated that "the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.*" (emphasis in original). Thus, "an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.* Here, the causes of action brought to recover the inventory and receivables are brought by both the Trustee and the Banks. The first question that needs to be addressed is whether the estate, in the wake of the relief from the stay, still retains an interest in the assets at issue. Second, if the estate has in effect forfeited an interest as to these assets, the question becomes whether the outcome of the causes of action brought by the Banks could have any conceivable effect on the bankruptcy estate.

The bankruptcy court answered the first question in the affirmative, holding "that *Maislin* provides ... better reasoning [than *Incor* ] of the effect of the lifting of the stay, in that it requires an affirmative action [for the creditor] to regain the property." *Opinion,* at 35. In support of this finding, the bankruptcy court noted that § 362(d) "merely *permits* a party to pursue state law action to regain its property" after the automatic stay has been lifted. *Id.* (emphasis in original). The bankruptcy court then indicated, without explanation, that as a result, the possibility remained that the estate would retain some assets that could inure to the benefit of unsecured creditors. Accordingly, the first question for this court is whether *Maislin* rather than *Incor* is correct. Complicating matters, however, is the split in the caselaw (and the confusion evident in the various published opinions) on this issue as

evidenced by the relevant cases that the parties fail to cite.[9]

### a. *Maislin Industries v. A.J. Hollander*

The logical starting point is *Maislin,* as that decision predated and was referred to by the *Incor* court. *Maislin* involved an adversary complaint filed by Maislin, the debtor, to obtain freight undercharges. Maislin, a freight carrier, filed a Chapter 11 petition. Subsequently, it hired an auditor to ascertain whether its customers (shippers) owed the estate additional money based on payments that had fallen short of the rates prescribed in the relevant tariffs. Maislin then filed an adversary complaint for the purpose of collecting these amounts.

The shippers contended that the bankruptcy court lacked subject matter jurisdiction because Maislin had but one secured creditor, the Canadian Imperial Bank of Commerce ("CIBC"), whose secured claim exceeded all of Maislin's property, including the accounts receivable due from the shippers for freight undercharges. *Id.,* at 773. Because the accounts receivable would never effectively accrue to the estate and nothing would be left for any of Maislin's unsecured creditors, the shippers argued that the claims against them were not "related to" the bankruptcy proceeding in that collection of the accounts receivable would not effect the administration of the estate. The trustee countered that under 11 U.S.C. § 541, the accounts receivable remained (at least technically) the property of the estate and that the claims for undercharges had thus been brought on behalf of the estate.

The district court rejected the shippers' arguments, adopting in their entirety the bankruptcy court's proposed findings of fact and law. Both courts concluded, therefore, that when the petition was filed, the receivables were unquestionably part of the estate under 11 U.S.C. § 541(a)(1). More importantly:

---

9. Additional cases supporting the BSL principals' position (although not cited by either party or by the bankruptcy court) include *In re Anderson,* 129 B.R. 44 (Bankr.E.D.Pa.1991), and *In re Lease–A–Fleet,* 141 B.R. 63 (E.D.Pa.), *aff'd without opinion,* 983 F.2d 1051 (3d Cir.1992).

Cases supporting the Banks' position, but again not cited by the parties or the bankruptcy court, are *Matter of Nebel,* 175 B.R. 306 (Bankr.D.Neb. 1994); *In re M.J. Cordry,* 149 B.R. 970 (D.Kan. 1993), and *In re Oakes,* 129 B.R. 477 (Bankr.N.D. Ohio 1991).

the receivables will remain property of the estate until either the automatic stay of 11 U.S.C. § 362 is lifted *and* CIBC obtains the receivables under applicable non-bankruptcy law, or until CIBC obtains them pursuant to a provision to that effect in a reorganization plan.

*Id.,* at 775 (emphasis added). Because the stay had apparently never been lifted *and* CIBC had not obtained the receivables pursuant to non-bankruptcy law, the bankruptcy court held, and the district court concurred, that the estate maintained an interest in the receivables and, thus, that the bankruptcy court had "related to" jurisdiction over the adversary claims.[10]

In support of its reliance upon *Maislin,* the bankruptcy court also cited *In re Dakota Drilling,* 135 B.R. 878, 889 (Bankr.D.N.D. 1991), for the proposition that the "debtor no longer had interest in [the] property once [the] secured creditor obtained relief *and* recovered his collateral." *Opinion,* at 35. In *In re Dakota Drilling,* the debtor's interest in the property was subject to the security interest of the bank, which had in turn assigned this interest to another individual, Earl Schwartz. The court noted that Schwartz had "obtained relief from the automatic stay and recovered his collateral; hence, [the estate's] interest in the [property] no longer exists." 135 B.R. at 889. It is far from clear, however, whether the court was implying that the recovery of the property (in addition to the lift of the stay) was necessary to extinguish the estate's interest in that property or whether the recovery of the property merely reinforced its conclusion

that the estate no longer retained any interest.

Although *In re Dakota Drilling* cannot be said to advance the Banks' claim, *Matter of Nebel,* 175 B.R. 306 (Bankr.D.Neb.1994); *In re M.J. Cordry,* 149 B.R. 970 (D.Kan.1993), and *In re Oakes,* 129 B.R. 477 (Bankr. N.D.Ohio 1991), most certainly do. In *Nebel,* the debtor filed a Chapter 7 petition. Within days of the filing of the petition, the Bank, which held a security interest in the debtor's livestock, was granted relief from the automatic stay so as to immediately dispose of the livestock, which was promptly sold and the proceeds remitted to the Bank. A similar stay relief order was granted as to the debtor's grain and machinery. After this property was sold and the proceeds distributed to the Bank and another secured creditor, the debtor was discharged and the bankruptcy case closed. Later, the IRS charged the debtor for the taxes due on the proceeds of the sale of these assets, and the debtor successfully moved to reopen the bankruptcy case.

Thereafter, the debtor filed an adversary proceeding against the United States and the Chapter 7 trustee to obtain a determination of his liability. The debtor claimed that it was the estate (and not the debtor) which should be liable for the taxes because the trustee did not properly abandon the assets and, thus, the assets belonged to the estate at the time of their sale. The United States and the trustee countered that the stay effected an abandonment of the assets thereby transferring those assets to the debtor. Therefore, they argued, the taxes on the sale

---

10. One further aspect of this decision bears note. Apparently, some question was raised as to the validity of CIBC's secured interest in Maislin's property. To settle this issue, CIBC agreed to release its lien on the receivables. While this would certainly make the receivables a part of the estate (and thus available to unsecured creditors), the bankruptcy court did *not* base its finding of "related to" jurisdiction on this post-petition change.

The post-petition settlement agreement to release the lien illustrated, in the court's opinion, exactly why the liquidation of secured receivables fell within the "related to" jurisdiction of the bankruptcy court. Thus, the mere fact that a party asserts a secured claim against the property of an estate does not a *fortiori* demonstrate

that the property which is the subject of the lien will ultimately bypass the estate entirely. As noted by the *Maislin* court, "[c]learly it often happens that a claimed security interest is invalidated for a wide range of procedural and substantive reasons." *Id.,* at 775. This potential, then, would seem to be the factor that animated the *Maislin* court's holding that a party must benefit from a lifting of the automatic stay *and* obtain the property under applicable non-bankruptcy law before the estate may be said to have been divested of all interest in the property. Absent such events, the potential that a secured claim may fail justifies the exercise of subject matter jurisdiction pursuant to "related to" jurisdiction.

of those assets were properly chargeable to the debtor. The question for the court was whether the relief from the automatic stay constituted an abandonment of the property.

The United States and the trustee cited several cases standing for the proposition that relief from the stay constituted an abandonment of the property, including two cases also cited by the BSL principals: *Incor* and *In re Hood,* 92 B.R. 648 (Bankr.E.D.Va.) *aff'd* without opinion, 92 B.R. 656 (E.D.Va. 1988). However, the *Nebel* court was unmoved by these cases for the following reason:

> Notwithstanding the finding of the above-listed authorities, the better rule is that the act of lifting the automatic stay is not analogous to an abandonment of the property. *In re Ridgemont Apartment Assocs.,* 105 B.R. 738, 741 (N.D.Ga.1989). If the two provisions were analogous, Section 554 [which governs abandonment] would be superfluous in any case in which relief from the stay was granted. This result would conflict with the principle that the Court should read and apply the plain language of the Bankruptcy Code. *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

> "The effect of abandonment by a trustee ... is to divest the trustee of control over the property because once abandoned, property is no longer a part of the bankruptcy estate." [citations omitted]. Relief from the automatic stay entitles the creditor to realize its security interest or other interest in the property, but all proceeds in excess of the creditor's interest must be returned to the trustee. *Killebrew v. Brewer (In re Killebrew),* 888 F.2d 1516, 1520 (5th Cir.1989). Abandonments are irrevocable, and to treat an abandonment as identical to relief from the automatic stay is inconsistent with the principle that property once abandoned may not be recovered by the bankruptcy estate. *Id.; accord Jones v. Star Bank (In re Angel),* 142 B.R. 194, 198 (Bankr.S.D.Ohio 1992) ("Relief from the stay did not effectuate an abandonment ... In a bankruptcy context, only abandonment constitutes a waiver of a trustee's interest.")

*Nebel,* 175 B.R. at 311–312. Not surprisingly, given this language, the *Nebel* court held that the trustee had not effectively abandoned the assets at issue (and the taxes were therefore chargeable to the estate).

Although the *Nebel* court never discussed subject matter jurisdiction, its holding comports with that of *Maislin* insofar as *Maislin* holds that relief from the automatic stay does not by itself eradicate the estate's interest in the assets that are subject to the stay relief order. Further, *Nebel* explicitly rejects the holding of *Incor,* upon which the BSL principals rely.

The court in *In re M.J. Cordry,* 149 B.R. at 973–74, likewise held that the mere lifting of the stay does not extinguish the bankruptcy court's subject matter jurisdiction, but did so in more explicit terms:

> "Relief from the stay simply removes the bankruptcy restraints on a claimant's rights to pursue contractual and non-bankruptcy remedies as to the matter in question. *In re Ridgemont Apartment Assoc.,* 105 B.R. 738, 741 (Bankr.N.D.Ohio 1989). This alone does not divest the bankruptcy court of jurisdiction over the property. *Id.; In re Oakes,* 129 B.R. 477, 479 (Bankr. N.D.Ohio 1991); *In re Fricker,* 113 B.R. 856, 864 (Bankr.E.D.Pa.1990). Indeed, jurisdiction is considered to be continuing until some action is taken which would necessitate the relinquishment of jurisdiction. *Oakes,* at 479."

See also, *In re Oakes,* 129 B.R. at 479 ("While relief from the stay permits a creditor to exercise its rights and remedies under applicable non-bankruptcy law, it does not mandate that such rights and remedies be exercised immediately.") This reasoning appears to be similar to that of the bankruptcy court here when it noted that 11 U.S.C. § 362(d) merely permits a creditor to pursue its remedies under state law after the stay has been lifted. *Opinion,* at 35.

One bankruptcy case from the Eastern District of Pennsylvania also follows, at least to some degree, the holdings of *Maislin, Nebel* and *Oakes.* In *In re Fricker,* 113 B.R. 856, 859 (Bankr.E.D.Pa.1990), the debtors brought an adversary proceeding in which they mounted a "broadside attack" on the

sheriff's sale of their home. Although neither party had raised the issue, the court noted its obligation to determine whether it had jurisdiction over the adversary proceeding. *Id.*, at 863–864. After noting that the debtor's action would normally qualify as a "core proceeding", the court stated that "[o]ur only question is whether, since we have granted both AAA and Neumann [the primary secured creditors] relief from the automatic stay, the controversy should be relegated to the state courts. *See In re Incor, Inc.*, 100 B.R. 790, 796 (Bankr.D.Md. 1989)". *Fricker*, 113 B.R. at 864.

The court, however, "refuse[d] to reach that result for several reasons." *Id.* The most pertinent reason for this refusal was as follows:

> First, a creditor's obtaining relief from the automatic stay as to certain property does not remove it from the category of property of the estate. *See In re Foster*, 105 B.R. 746, 748 (Bankr.M.D.Ga.1989); *In re Ridgemont Apartment Assocs.*, 105 B.R. 738, 741–42 (Bankr.N.D.Ga.1989); and *In re Hood*, 92 B.R. 648, 651 (Bankr.E.D.Va. 1988).

*Fricker*, 113 B.R. at 864. The court went on to explain that the grant of relief from the automatic stay typically diminishes the estate's interest in the property but does not necessarily extinguish jurisdiction over the property:

> Therefore, while we believe that granting relief from the stay as to certain property normally diminishes significantly the estate's interest in that property, as a result of which a bankruptcy court should decline to intervene with post-stay-relief proceedings, we do not believe that granting relief from the stay deprives a bankruptcy court of jurisdiction over the property.

*Id.* This passage coincides with *Maislin*'s rule that more is required to extinguish the estate's interest in the property than the mere lifting of the stay.

Thus, even beyond *Maislin* there is a substantial body of authority holding that the mere lifting of the stay is not enough by itself to extinguish the estate's interest in the collateral subject thereto. Pitted against this rule, however, is *Incor* and its progeny.

## 2. *In re Incor*

The BSL principals assert that the bankruptcy court's reliance upon *Maislin* was misplaced because *Maislin* misstates the law and that *Incor* should have been followed. In 1987, the debtor, Incor, filed a petition for bankruptcy under Chapter 11. At that time, the First National Bank of Maryland held the only secured claim against Incor, a claim which encompassed all of Incor's property, receivables and intangibles. Because of a short-lived adversary complaint filed by Incor in February of 1988 claiming certain deficiencies in the Bank's post-petition financing (the complaint was dismissed nine months later), the Bank applied for emergency relief from the automatic stay lest it be unable to collect the diminishing accounts receivable. In early March of 1988, the automatic stay was lifted. In October of 1988, the Bank filed an adversary complaint against the United States Wall Corporation ("Wall") for the purpose of recovering accounts receivable that Wall owed Incor. Wall, in turn, filed a motion to dismiss claiming that the bankruptcy court lacked subject matter jurisdiction over the adversary complaint.

The bankruptcy court agreed with Wall, holding that the lifting of the stay by itself extinguished any interest in the collateral:

> The problem with the cases cited by the Bank is that they do not support its position in the instant case ... where the receivables are no longer property of the estate by reason of the automatic stay having been modified in favor of the Bank at its request. Because of the modification of the stay, neither this Court nor the Chapter 7 trustee any longer has any interest in the Bank's collateral. Whether or not the Bank is successful in its collection efforts will have no impact on the administration of this bankruptcy estate. As a result, the instant complaint is thereby a *non-core proceeding unrelated to the bankruptcy case.*

*In re Incor*, 100 B.R. at 796 (emphasis in original). Thus, the bankruptcy court, without reference to *Maislin*, determined that the lift of the stay alone was sufficient to

terminate the estate's interest in the property. It noted, however, that "the Bank is the only creditor claiming an interest in the debtor's accounts receivable". *Id.,* at 799. Therefore, the court concluded that "[t]he recovery of receivables proceeds by the Bank will not affect the recoveries of other creditors." *Id.* Accordingly, the court found no "link between the disposition of claims to abandoned property and the treatment of other creditors." *Id.* (quoting *In the Matter of Xonics, Inc.,* 813 F.2d 127, 132 (7th Cir. 1987)). It is unclear from the opinion what would have become of the receivables had the Bank's claim proved unavailing. The court seems to imply, however, that the Bank would have gotten the receivables regardless of its status as a secured creditor, but why that would be so is unclear.

The district court affirmed the bankruptcy court's decision for essentially the same reasons. *See In re InCor,* 113 B.R. 212 (D.Md. 1990). The district court, however, confronted the contrary authority of *Maislin* and attempted to distinguish that case. First, the court noted that in *Maislin,* the *debtor* instituted the action on its own behalf to retain the receivables. *In re InCor,* 113 B.R. at 215. Thus, reasoned the *InCor* court, the receivables in *Maislin* (although clearly earmarked for the Bank) actually stayed within the estate of the debtor. Only a post-petition event could remove the property from the estate when the stay was lifted at the behest of the *trustee. Id.* On the other hand, the

court held that once the *bank* (the secured creditor) obtained relief from the stay so as to proceed against Wall personally, "the estate lost all interest in the property." *Id.* Granting relief from the stay meant that "InCor no longer had any obligation to administer the receivables for the benefit of [the Bank], nor could InCor [the debtor] later redeem the secured property." *Id.* Thus, "[t]he lifting of the stay was essentially equivalent to an abandonment of the property", and the bankruptcy court, accordingly, could not assume subject matter jurisdiction over the property. *Id.* [11]

In addition to *InCor, In re Anderson,* 129 B.R. 44 (Bankr.E.D.Pa.1991), would support a finding that the mere lifting of the automatic stay extinguishes the bankruptcy court's subject matter jurisdiction. In *Anderson,* a public housing resident filed for voluntary bankruptcy under Chapter 7. After the case was initially closed, the debtor filed a motion to reopen to add the Pennsylvania Department of Public Welfare as a creditor and to file an adversary proceeding against the Chester Housing Authority. The motion was granted and the adversary proceeding, which concerned the debtor's leasehold interest in an apartment unit that her mother had abandoned, went to trial.

The *Anderson* court noted that it had a duty to question its subject matter jurisdiction. The court then noted that "[o]ne pertinent issue which has been the subject of

---

11. As noted earlier, the BSL principals also cite *In re Hood,* for the principle that the lifting of the stay is effectively an abandonment of the property by the debtor. While this case did invoke language that appears helpful to appellants, it is important to note that the case did not involve any discussion of the bankruptcy court's "related to" jurisdiction. Rather, that far different case involved an adversary complaint brought by a debtor-in-possession who sought to set aside a foreclosure sale of his residence, with relief from the automatic stay for the purpose of conducting the foreclosure sale granted after the debtor failed to make any payments under a refinancing plan.

In addressing the debtor's various arguments, the court made the following general statement concerning the effect of the automatic stay, a statement upon which appellants now rely:

> After the bankruptcy court has entered an order granting relief from the automatic stay, the subject property is generally consid-

ered to be removed from the estate even though it may technically and temporarily remain property of the estate under Section 541. The status of the property following the relief from the stay is similar to that following an abandonment. Property abandoned pursuant to Section 554 generally cannot be recovered by the debtor's estate notwithstanding a later determination of value which might have benefitted the estate. 92 B.R. at 655–656. While the language contained within the above passage is clearly helpful to the BSL principals, it is directly and convincingly rejected by the *Nebel* court. *Hood* is also silent about jurisdictional implications and, accordingly, gives no indication as to whether the fact that the property remains "technically and temporarily" within the estate would justify the exercise of "related to" jurisdiction. Thus, *In re Hood* can be said to advance the BSL principals argument, but only to a limited degree.

some dispute among various bankruptcy courts is whether a bankruptcy court retains jurisdiction to adjudicate the right to property of the debtor after the court has granted a creditor relief from the automatic stay to exercise all of its rights to that property under applicable non-bankruptcy law in another forum." *Id.*, at 48. It then proceeded to review the conflicting caselaw on this issue, but did not weigh in on the relative merit of the positions set forth in the cases it cited.

Ultimately, the court concluded that it did not have subject matter jurisdiction over the adversary proceeding, a finding that was foreshadowed by the subheading preceding its discussion on subject matter jurisdiction:

> RELIEF FROM THE AUTOMATIC STAY AS TO CERTAIN PROPERTY OF THE DEBTOR GENERALLY ELIMINATES BANKRUPTCY COURT JURISDICTION OVER CONTESTED MATTERS RELATING TO THAT PROPERTY

*Id.* It is unclear, however, that relief from the automatic stay would alone have necessitated the court's conclusion, because the court relied on several other factors as well in declining to exercise subject matter jurisdiction:

> If a discharge is entered in a main case to which a proceeding is related, *if relief from the stay is granted as to the property in issue,* if a leasehold interest in issue has been abandoned to the debtor, OR if the underlying main bankruptcy case is closed, the general rule is that the bankruptcy court will not exercise its jurisdiction. When ALL FOUR of these conditions are present, as here, the difficulties in obtaining exceptions from the denial of exercise of bankruptcy court jurisdiction are heightened, if not overwhelming.

*Id.*, at 50 (emphasis added) (capitals in original). *See also, In re Lease–A–Fleet,* 141 B.R. at 66 ("This result is supported by the principle that relief from the automatic stay normally eliminates bankruptcy court jurisdiction. [citing *Anderson* ].") While this passage from *Anderson* counsels against the exercise of subject matter jurisdiction, it does not go so far as to preclude the exercise of subject matter jurisdiction in every case in which the automatic stay has been lifted.

### 3. *The Case at Bar in Light of Maislin and Incor*

While *Maislin* and *InCor* are not necessarily contradictory,[12] the bankruptcy court opted to follow the reasoning of *Maislin* and reject that of *InCor.* The court explained that 11 U.S.C. § 362(d), which provides for relief from the automatic stay, does not by itself remove the subject property from the estate, but merely allows the creditor who obtains the relief to then pursue the property under non-bankruptcy law. In other words, the mere lifting of the stay in and of itself does not bestow any rights in the subject property. It is only until some post-lifting action is taken that the property's ownership status will change (and, presumably, be removed from the estate). The bankruptcy court, however, did not directly address the attempt of the *InCor* court to reconcile its holding with that of *Maislin,* and it did not directly address whether the identity of the party obtaining relief from the stay was of any significance. Nor did the court indicate whether it was swayed by the *Maislin* court's reliance on the possibility that a secured interest might prove invalid as a basis for its finding that the bankruptcy court had "related to" jurisdiction over the adversary complaint. Thus, even aside from whether the bankruptcy court's conclusion was correct, its opinion raises more question than it answers.

Despite these deficiencies, this court concurs with the bankruptcy court, at least insofar as it held "that *Maislin* provides the better reasoning of the effect of the lifting of the automatic stay". *Opinion,* at 35. To

---

12. While it might be possible to reconcile *Maislin* and *InCor* by focusing on the identity of the parties who obtained relief from the stay in each case (the trustee in *Maislin* versus the creditor bank in *InCor* ), *InCor* cannot be reconciled with *Nebel, Cordry* and *Oakes.* Moreover, in *Nebel,* as in *InCor,* it was the creditor bank that obtained relief from the stay. Nonetheless, the *Nebel* court rejected the notion that the mere lifting of the stay divested the estate of all interest in the property subject thereto simply because it was the creditor who had obtained the relief.

begin with, the *Maislin* court's reliance upon the possibility of an imperfect security interest as a justification for requiring more than the mere lifting of the stay is fairly easy to reconcile with the Third Circuit's holding in *Pacor*, which required only a *conceivable* effect on the estate being administered in bankruptcy. 743 F.2d at 994. This court is further persuaded by the powerful reasoning of the *Nebel* court which pointed out that to hold the lifting of the automatic stay to be equivalent to an abandonment would, in effect, render Section 554 superfluous whenever such relief had been granted. Even more significantly, to hold that lifting a stay would effect an abandonment would foreclose the possibility that any assets subject to the stay relief order could return to the estate, even where the amount sought by the creditor who obtained the relief is far less than the total value of the assets that fall within the scope of the stay relief order. Finally, a rule under which the lifting of the stay constitutes an abandonment as a matter of law would seem difficult to reconcile with § 362(d) which, as the bankruptcy court pointed out, merely permits a creditor to attempt to regain the property subject thereto.

■ However, the task for this court, as stated earlier, is not merely to determine whether *Maislin* and *InCor* present conflicting rules of law and which provides the better reasoning, but also to determine whether the instant case falls within the scope of either holding. In other words, assuming that the rule stated in *Maislin* is correct and that some step beyond the mere lifting of the stay is required before an abandonment will be effected, this court must determine whether anything has occurred here which would constitute that additional "step" and thereby signal that this case falls beyond the reach of *Maislin* for the purpose of vesting subject matter jurisdiction in this court. Thus, having determined that, in its view, *Maislin* states the better rule, this court must turn to its first basic question: under the circumstances of this case, does the estate (and the Trustee) retain an interest in the assets that were subject to the relief granted by virtue of the April 6, 1992 Stay Relief Order.

■ There are two critical details that distinguish this case from *Maislin* and its progeny and convince this court that the estate no longer has a direct interest in the assets the subject of the April 6th order, i.e., the inventory and the accounts receivable. First, in obtaining relief from the automatic stay, appellees stipulated that the estate had no equity interest in the assets in question. *See Schnog Affidavit*, Exhibit V, at 3 ("the Debtor does not have any equity in the inventory and accounts receivable, and [ ] this collateral is not necessary to an effective reorganization of the Debtor's estate").[13] Argument can well be made that this stipulation is enough to rebut any claim by appellees that it is "conceivable" that the estate may have an interest in these assets either because, under the reasoning of *Maislin*, the Banks' secured interests may prove invalid or because there may be surplus monies to flow back to the estate.[14] Moreover, at oral argument, counsel for appellants represented that the Trustee had stipulated that the secured interests were valid, further allaying any fear that the secured interests may fail,

13. Tellingly, appellees make no mention of this stipulation in their brief, perhaps in the hope that this court will ignore it, as the bankruptcy court did. They refer to it only indirectly, and solely to point out that the April 6, 1992 Stay Relief Order (into which the stipulation was incorporated) did not encompass the general intangible of the right to use B.S. Livingston's tradename.

14. The possibility that there will be proceeds from the liquidation of receivables or inventory above and beyond that needed to satisfy the secured interest would normally be enough to establish "related to" jurisdiction in the bankruptcy court. *See In re Olympia*, 161 B.R. 524, 528, n. 4 (M.D.Fla.1993) ("The Bankruptcy Court only loses jurisdiction over these receivables, upon the lifting of the stay, when there is no possibility a surplus will remain.") (citing *In re InCor*, 113 B.R. 212, 215 (D.Md.1990). Even without the stipulation, however, this court could easily conclude that there is no chance that there would be any excess left for the debtor from the liquidation of the receivables and inventory (and without reference to any general intangibles) given that the Banks' secured claims substantially exceed even the Banks' accountant's estimate of the value of the transferred assets. *See Certification of Robert McCarthy*.

a factor which proved so crucial in *Maislin*. [15] Accordingly, this court is satisfied that these stipulations serve as the additional "step" beyond the mere lifting of the stay that is required to find that the estate has no interest in the assets subject thereto.[16]

While this finding may undermine the basis for the bankruptcy court's holding inasmuch as it relied upon *Maislin*, it by no means ends the inquiry. Rather, this court must reach the second question; namely, whether the bankruptcy court could nonetheless exercise subject matter jurisdiction over the claims before it even though the estate no longer had any interest in the inventory and accounts receivable.

To begin with, appellants have done little to demonstrate that the estate has relinquished its interest as to claims of the adversary complaint which encompass assets that were not subject to the Stay Relief Order. First, despite labeling the issue a "red herring", appellants have failed to show that the Trustee does not have a valid claim as to the tradename, a general intangible. Appellees assert that the monies generated by the wrongful use of the tradename rightfully belong to the debtor, while appellants contend that any such monies are negligible. This court, however, cannot at this stage determine the value of the tradename and, even assuming that its value is negligible, this court is aware of no authority that would mandate a finding that the claim to its ownership or use may or must, therefore, be ignored, at least for purposes of a determination of subject matter jurisdiction.

More importantly, appellants have not even attempted to contest the validity of the Trustee's claim for successor liability.[17]

Thus, even assuming that the Trustee has forfeited any claim to the inventory and accounts receivable by virtue of the aforementioned stipulations, the Trustee nonetheless retains causes of action for which subject matter jurisdiction is clearly vested in this court.

Furthermore, the mere fact that the Trustee has relinquished any claim to the inventory and assets does not automatically extinguish subject matter jurisdiction even as to those claims under the unique circumstances of this case. After all, the *Pacor* test for determining whether there is subject matter jurisdiction over a claim does not inquire whether the outcome of the proceeding could conceivably have any effect on whether the estate has an interest in *particular assets* but, rather, asks whether the outcome of the proceeding could have any conceivable effect on the *"estate being administered in bankruptcy"*. 743 F.2d at 994. Here, it is possible that the outcome of the claims encompassing the inventory and receivables could still have an effect on the administration of the estate. Assuming, for example, that the Banks recover significant amounts on these claims and that the BSL principals and Stemcor are held liable for the entirety of BSL's debts and assessed consequential damages on the successor liability claim, it is possible that the inventory/receivables recovery could affect how much, if anything, is left in the estate after the Banks' secured claims have been satisfied. Thus, and concededly very hypothetically, if the Banks are owed a total of $10 million in secured claims, and the Banks receive $2 million on their inventory/receivables claims while the successor liability claims generate

---

15. While counsel did not produce this stipulation at oral argument, appellees did not take issue with this representation.

16. This court rejects the November 13, 1992 "Clarification Order" as a legitimate basis for finding that the Trustee retained an interest in the inventory and accounts receivable. That order was essentially an attempt to rewrite the April 6, 1992 Stay Relief Order. However, once the Trustee and the Banks' had stipulated that they had *no* interest in these assets, it certainly appears that they lacked standing, months later, to stipulate to something quite different.

17. Admittedly, by asserting that the other claims in the adversary complaint (Counts 1–8) should be dismissed, appellants have implicitly suggested that the cause of action based upon successor liability (Count 9) must be dismissed as well. However, they have not suggested any independent ground for the dismissal of this count, nor have they attempted to argue that a valid claim for successor liability can only be brought by the Banks even if the estate has relinquished its rights to assets that formally belonged to it.

$5 million apiece for the Banks and the Trustee, a total of $2 million would be left for the estate even after the Banks had been made whole. Without the recovery of $2 million on the inventory/receivables claims, nothing would have been left for the estate under this example. Thus, even though the estate has no direct interest in the assets that are the subject of the inventory/receivables claims, the ultimate disposition of those claims could conceivably have an impact on the administration of the bankruptcy estate.

 Even assuming that a return of this magnitude is not "conceivable", under *Pacor* subject matter jurisdiction is vested as to the entire adversary proceeding once it is established that the Trustee retains an interest as to assets that would be the subject of claims, this court holds, for general intangibles and successor liability. The *Pacor* test asks "whether the outcome of th[e] *proceeding* [as opposed to each individual claim within the proceeding] could conceivably have any effect on the estate being administered in bankruptcy." 743 F.2d at 994. (emphasis added). Thus, this court need not permit itself to be sidetracked by speculation as to whether the amounts that might be generated on the inventory/receivables claims would be great enough to ultimately effect the administration of the estate. Rather, it is enough that the proceeding taken as a whole could conceivably effect the administration of the estate. Here, wholly aside from the ultimate outcome of the inventory/receivables claims, it is clear that the general intangible claim and the claim for successor liability could have a substantial effect on the estate. That alone is enough to vest subject matter jurisdiction in this court over the adversary proceeding as a whole.

Accordingly, this court is satisfied it has subject matter jurisdiction over all the claims presented in the adversary complaint, as did the bankruptcy court.

### C. Did the Bankruptcy Court Err in Refusing to Abstain from Determining the Issues raised in the Adversary Complaint?

 The bankruptcy court elected not to abstain from hearing and determining the issues raised in the adversary complaint. The BSL principals argued that, in the event the bankruptcy court determined that it had subject matter jurisdiction, it should nonetheless abstain because of the state-law based nature of the Banks' claims and the fact that the estate retained no interest in the collateral. The bankruptcy court found that the estate maintained an interest in the collateral in the form of the Trustee's claim and that the Banks' claims, if successful, might also accrue to the estate's benefit. Further, it noted that while the Banks' claims were state-law-based, "the Trustee's [fraudulent conveyance] claim stems from the Bankruptcy Code". *Opinion*, at 37. Thus, "[i]f the Court were to abstain, then the state court would address a bankruptcy matter in addition to the state law claims." *Id.*

 Under 28 U.S.C. § 1334(c)(1), the district court—and the bankruptcy court by reference—has the discretion to abstain from hearing certain matters. That section provides:

> (c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for state law, from abstaining from hearing a particular proceeding arising under title 11, or arising in or related to cases under title 11.

The bankruptcy court noted that "the primary determinant for the exercise of discretionary abstention is whether there exist[s] [sic] unsettled issues of state law. *In re Earle Indus., Inc.,* 72 B.R. 131, 133 (Bankr. E.D.Pa.1987)." *Opinion*, at 36. As it recognized, however, discretionary abstention may be exercised even where the relevant state law is settled. *Id.* (citing *In re Wilson,* 85 B.R. 722, 727 (Bankr.E.D.Pa.1988)). Discretionary abstention should be exercised cautiously and sparingly. *In re Hillsborough Holdings Corp.,* 123 B.R. 1004 (Bankr. M.D.Fla.), *aff'd* 123 B.R. 1018 (M.D.Fla. 1990).

 Generally, courts will look to a host of factors to determine whether discretionary abstention is appropriate. These factors include, in no particular order, the following: (1) the court's duty to decide matters proper-

ly before it; (2) the effect abstention will have on the efficient and economic administration of the debtor's estate; (3) the possibility of inconsistent results stemming from abstention; (4) the risk of the duplicative and uneconomic use of judicial resources; (5) the presence of difficult or unsettled questions of state law that would be more appropriately addressed by a state court; (6) comity considerations; (7) the prejudice to any non-debtor party of proceeding in federal court; (8) the extent to which state law issues predominate over bankruptcy issues; (9) the presence of a related proceeding commenced in the state court; (10) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (11) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (12) the substance rather than form of an asserted "core" proceeding; (13) the feasibility of severing state law claims from core bankruptcy matters; (14) the burden to the court's docket; (15) the existence of a right to jury trial; and (16) the presence in the proceeding of non-debtor parties. *Id.*, at 1013; *In re Total Technical Services, Inc.*, 142 B.R. 96 (Bankr.D.Del.1992); *In re Naugatuck Dairy Ice Cream Co., Inc.*, 106 B.R. 24 (D.Conn.1989).

It follows, then, given this multitude of factors, that the bankruptcy court correctly determined that it had an ample basis for declining to abstain. After all, there is no concurrent state proceeding, there exists a presumption that the bankruptcy court should decide matters properly before it, relinquishing jurisdiction over the adversary complaint would most likely have had a negative effect on the efficient administration of the bankruptcy estate, a potential risk of duplicative litigation exists, there is no contention that there are difficult or unsettled questions of state law at issue, and no party has articulated any prejudice that would befall any non-debtor if the proceedings were to continue in federal court. Furthermore, at the heart of the adversary complaint is a claim of fraudulent conveyance, which, by definition, is closely linked to bankruptcy proceedings. Thus, the bankruptcy court did

not abuse its discretion in determining not to abstain; indeed, that determination was eminently correct. *See e.g., Matter of Glen Properties*, 168 B.R. 537, 538 (D.N.J.1993).

## IV. *THE APPEAL ON THE MERITS*

### A. Choice of Law: Did the Bankruptcy Court correctly determine that New Jersey Law applies to the Claims in the Adversary Complaint?

■ The BSL principals contend that the bankruptcy court erred in applying New Jersey law to all but one of the claims set forth in the adversary complaint.[18] Rather, they contend that under New Jersey's choice-of-law rules, New York law should have been applied to those claims, which this court assumes to be the claims set forth in Counts 3, 5, 6 and 7, as to which the substantive law of New York and New Jersey differs. They base this contention on the allegedly greater contacts that New York has with this litigation, contacts which include the fact that each of the Banks has its principal place of business in New York and the fact that some of the individual defendants reside in New York. Additionally, they invoke, as virtually controlling, the forum selection clause in the credit agreement between the Banks and the debtor, the agreement from which they argue the Banks' rights derive, which provides that "[t]his Agreement shall be governed by, and interpreted and construed in accordance with, the law of the State of New York". The BSL principals observe that "[i]t is well settled that the law of the state chosen by the parties will be honored so long as that choice does not contravene a fundamental policy of New Jersey". Appellant's Brief at 29, quoting *Turner v. Aldens, Inc.*, 433 A.2d 439, 179 N.J.Super. 596 (1981).

Appellees briefly respond as follows: the forum selection clause of the credit agreement is of no import inasmuch as no defendant named in the adversary complaint is a party to that agreement and, thus, the BSL principals cannot claim that the forum selection clause governs the relationship between appellees and themselves. Appellees point

---

**18.** The bankruptcy court, the parties concede, correctly found that Delaware law applies to Count 8.

out as well that the debtor's principal place of business is in New Jersey and, thus, New Jersey's strong public policy of preventing the commission of business torts against corporations conducting business within the state must control.

The parties agree on the basic principles undergirding the application of the appropriate state law. Thus, all agree that a federal court must look to the forum state's choice of law principles to determine the appropriate state law to be employed. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). All agree that New Jersey applies a "governmental interest" test to determine the appropriate state law to be applied, under which test "the determinative law is that of the state with the greatest interest in governing the particular issue." *Veazey v. Doremus*, 510 A.2d 1187, 103 N.J. 244, 248 (1986). Further, it is undisputed that the procedure to be followed and the findings to be made are set forth in *Veazey*, and control here:

> The first step in the analysis is to determine whether a conflict exists between the law of the interested states. Any such conflict is to be determined on an issue-by-issue basis.
>
> ... If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties ... If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply ... Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply.

*Id.*, 510 A.2d 1187, 103 N.J. at 248. (citations omitted). As is apparent from this passage, "the laws of different states may apply in the same case to different issues in the case", depending on the governmental interests implicated. *Pollock v. Barrickman*, 610 F.Supp. 878, 879 (D.N.J.1985).

While appellants may well have given the bankruptcy court the requisite chapter and verse, they have given this court little more than basic principles, a recitation of what New York law is, and the conclusion that New York law applies. There is little discussion of New Jersey law and utterly no discussion of what policies underlie that law much less how those policies are affected by each state's contacts to the litigation. The bankruptcy court analyzed the choice of law issue claim by claim and concluded that New Jersey law applied because of New Jersey's "compelling interest in providing redress to a corporation doing business within New Jersey", such as B.S. Livingston, and New Jersey's "policy to hold corporate officers liable for tortious conduct". Opinion at 48–49. Appellants have not shown that the bankruptcy court's conclusion was other than eminently correct, and that conclusion is affirmed.

### B. The BSL Principals' Motion to Dismiss and/or for Summary Judgment on the Individual Counts

While basing their motion to dismiss primarily on subject matter jurisdiction grounds, the BSL principals also moved to dismiss each of the counts set forth in the adversary complaint for failure to state a claim upon which relief may be granted and, in the alternative, moved for summary judgment. Certain of their arguments are inextricably intertwined with their arguments on subject matter jurisdiction and will not be considered anew. Certain distinct arguments are made in support of these motions and it is to those arguments that the court will now turn.

#### 1. Counts 1 & 2: Fraudulent Conveyance

Counts 1 and 2 of the adversary complaint assert fraudulent conveyance claims against the BSL principals. In support of their Rule 12(b)(6) motion to dismiss, the BSL defendants assert two grounds: (1) the Trustee no longer has any interest in the transferred property; and (2) even if the estate maintained an interest in any of the property, the BSL principals—Alfred Schnog, Anita Schnog and Alfred Ouaknine—cannot be defined as "transferees" within the meaning of 11 U.S.C. § 548 or § 550. *Appellants' Brief,*

at 32–35. As to their summary judgment motion, the BSL principals argue that appellees have offered nothing to demonstrate that the debtor received anything short of adequate consideration for the assets that were transferred. *Appellants' Reply Brief,* at 14.

Appellees respond to these arguments in several ways. First, appellees contend that the estate maintained an interest in all of the assets because anything left after the Banks' secured interest was satisfied would accrue to the estate. This court has fully addressed this contention in its discussion on subject matter jurisdiction and will not further address it here. Second, the Banks argue that the BSL principals construe the definition of "transferee" too narrowly, because that term encompasses those for whom the transfer was made. Here, argue the Banks, the transfer was made not merely for the benefit of Stemcor but also for the benefit of the BSL principals themselves in that they received positions with Stemcor and their compensation was in part tied into the profitability derived from the BSL assets controlled by Stemcor. To counter the BSL principals' motion for summary judgment, the Banks rely on the certification of Robert J. McCarthy which assesses the fair market value of the transferred assets at no less than 2.1 million dollars. Further, they assert that a factual dispute exists as to whether or not the transfer constituted a transfer of the assets from BSL Livingston to the BSL principals inasmuch as the principals were granted a right to a portion of the gross profits of the transferred assets. *Appellees' Brief,* at 28–29.

The bankruptcy court found in favor of appellees on each and every one of these points and concluded that "[t]his Court will not dismiss the first and second counts as to the BSL Principals. The Court finds that genuine issues of material fact remain in dispute on whether the BSL Principals were transferees." *Opinion,* at 40–43.

### a. Do the BSL Principals Constitute "Transferees" under § 550(a)?

■ For a trustee to avoid a transfer, certain conditions must be met. To the ex-

tent that the claim of fraudulent conveyance is brought against the BSL principals (it is, of course, brought against Stemcor as well), appellees must demonstrate that Alfred Schnog, Anita Schnog and Alfred Ouaknine are proper defendants within the meaning of 11 U.S.C. § 550(a). That section provides as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer *or the entity for whose benefit such transfer was made;* or

(2) any immediate or mediate transferee of such initial transferee.

(emphasis added).

The parties inappropriately rely upon the test for qualification as that for a "transferee", as set forth in *Bonded Financial Services v. European Amer. Bank,* 838 F.2d 890 (7th Cir.1988). In *Bonded,* the Honorable Frank Easterbrook observed that while the term "transferee" is nowhere defined in the Bankruptcy Code and there is no legislative history that sheds light on its meaning, "we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 893; *see also, In re Chase & Sanborn Corp.,* 848 F.2d 1196 (11th Cir.1988); *In re Bullion Reserve of North America,* 922 F.2d 544 (9th Cir. 1991).[19] While citing this definition, the bankruptcy court did not address whether the BSL principals fit within it, albeit implicitly finding that they might by denying the motion to dismiss.

While the parties have expended much effort disputing whether the BSL principals qualify as "transferees", they have missed a critical point made in *Bonded* that resolves this dispute, at least in this court's view:

---

**19.** Although the Third Circuit has yet to explicitly adopt Judge Easterbrook's definition, that defini-

tion has been adopted the 4th, 5th, 6th, 7th, 9th, and 11th Circuits.

transferees and entities who benefit from the transfer are distinct. The following passage amply demonstrates this distinction:

> There is no legislative history concerning the "entity for whose benefit" language and little legislative history for the rest of § 550.... We are left with the inference from structure: § 550 distinguishes transferees (those who receive money or other property) from entities that get a benefit because someone else received the money or property.
>
> To say that the categories "transferee" and "entity for whose benefit such transfer was made" are mutually exclusive does not necessarily make it easy to determine in which category a given entity falls....

*Bonded,* 838 F.2d at 896; *see also, In re Blackburn Mitchell, Inc.,* 164 B.R. 117, 130 (Bankr.N.D.Cal.1994).

This court, therefore, need not be distracted by a discussion of the meaning of "transferee". Clearly, the BSL principals were, at least in part, "entities for whose benefit" the Stemcor transaction was consummated.[20] Thus, the bankruptcy court correctly declined to dismiss Counts 1 and 2 as against the BSL principals, albeit for a reason other than the reason it cited.

**b. Was Summary Judgment Appropriate on the Ground that there is no Genuine Issue of Material Fact as to Whether the Debtor received Fair Market Value of the Transferred Assets?**

Appellants argue that summary judgment should have been granted because appellees have raised no genuine issue of material fact to counter appellants' showing that the debtor received the fair market value of its assets in the Stemcor transaction. In support of this assertion, appellants rely on the affidavits of Alfred Schnog. In his initial affidavit, Mr. Schnog asserts that "[o]ur motivation [in concluding the Stemcor transaction] was solely to receive the maximum possible [return] for BSL's assets, to effect an orderly liquidation, and to pay off the Banks' loans." *Schnog Affidavit dated September 28, 1993,* at 15. Further, Mr. Schnog contends that "[t]he agreements with Stemcor were reached only after months of negotiations, reflecting a fair, arms length agreement and further reflecting great efforts to secure the best terms possible for BSL and its creditors." *Id.,* at 16. Mr. Schnog concludes that "BSL received the highest possible price for its inventory, and the conclusory charge that BSL did not receive fair value is absurd." *Id.,* at 17. He further denies that the Stemcor transaction rendered BS Livingston insolvent or that the BS Livingston name was turned over to Stemcor without consideration. *Id.,* at 18–20.

In response, appellees have submitted the certification of Robert J. McCarthy, an accountant who purports to have wide experience in the review of insolvent companies. Based upon his review of BS Livingston's books, Mr. McCarthy concluded that in September of 1991 (at the time of the Stemcor transaction), "BSL was insolvent in that the sum of BSL's debts was greater in September 1991 than all of its property then owned at fair valuation." *McCarthy Certification,* at 3–4. Mr. McCarthy also conducted a preliminary valuation of the Stemcor transaction and concluded as follows:

> Several transactions combine to create a disguised sale of the BSL business to Stemcor, for less than fair value. Stemcor purchased selected saleable inventory for an amount approximately equal to cost even though much of the inventory was "pre-sold" at a profit. In addition, Stemcor purchased the outstanding sales orders of BSL for an amount equal to forty percent of any profit. Finally, as part of the license agreement and personal service contracts Stemcor acquired the customer lists, product resources lists and management of BSL for one dollar. When taken together these purchases mean that Stemcor had effectively acquired all of the essentials to the BSL trading business, at a price less than the value of the hard assets and contract rights with no consideration

---

**20.** *Bonded* makes clear that an "entity" may include an individual. 838 F.2d at 896 ("Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within the language.")

at all for the going concern value of the business. Accordingly, it is my opinion that the BSL business was sold for less than fair consideration.

*Id.,* at 4–5. He goes on to opine that Stemcor did not pay fair value for the inventory, and that "Stemcor cherry-picked the most valuable BSL assets." *Id.,* at 5. In sum, he concludes that the fair value of all the assets transferred to Stemcor was at least $2.1 million. Although brief, the McCarthy certification paints a very sinister picture of the Stemcor transaction.

Appellants, in response, submitted a second affidavit from Mr. Schnog that essentially accused those who submitted certifications on behalf of the Banks of engaging in gross distortion and outright lies. Mr. Schnog states, for example, that Mr. McCarthy directly contradicts himself by saying at one point that BSL's records were poorly kept while stating elsewhere that they "had been sufficiently well kept through September 1991". *Schnog Affidavit dated December 8, 1993,* at 16. Even a cursory reading of the McCarthy certification reveals that there is no contradiction whatsoever: McCarthy states that the records were well kept until September 1991, but poorly organized thereafter. *McCarthy Certification,* at 3. Similarly, Mr. Schnog accuses Mr. McCarthy of "distort[ing] the truth by stating that much of the selected 'inventory was already under contract of sale to purchasers when Stemcor bought it' ". *Schnog Affidavit dated December 8, 1993,* at 18. Likewise, Mr. Schnog alleges that "Mr. McCarthy bases his conclusion on fabricated terms which do not exist in the Stemcor agreements." *Id.*

Whatever the merits of Mr. Schnog's claims (and it is difficult to imagine a more self-interested affidavit than his), it is clear that there are material facts in dispute as to whether the Stemcor transaction was fraudulent, and, in particular, whether the assets were sold at less than fair market value. Clearly, summary judgment was inappropriate on Counts 1 and 2 (and, by extension, Count 3 (aiding and abetting a fraudulent transfer)), and the bankruptcy court was correct in so finding.

### 2. Count 4: Conversion

■ Appellants do not claim that the Banks' conversion claim should have been dismissed for failure to state a claim. Rather, they argue that summary judgment should have been granted in their favor because (1) the BSL principals exercised no dominion over the transferred assets; (2) the Banks incurred no damage as a result of the transfer; and (3) the Banks acquiesced in the transfer.

Appellees beg to differ, claiming, quite logically, that the BSL principals orchestrated the transfer, that the McCarthy certification demonstrates that the Banks were indeed damaged, and that at no time did the Banks acquiesce in the transfer.

The law of conversion in New Jersey is set forth in *Chemical Bank v. Miller Yacht Sales,* 173 N.J.Super. 90, 99, 413 A.2d 619 (1980), wherein the court stated the following:

> Generally, one who exercises unauthorized acts of dominion over the property of another inconsistent with or to the exclusion of the latter's rights therein is liable for conversion, although he acted in good faith and in ignorance of the rights of the owner. *McGlynn v. Schultz,* 90 N.J.Super. 505, 526, 218 A.2d 408 (Ch.Div.1966), *aff'd* 95 N.J.Super. 412, 231 A.2d 386 (App.Div.), *cert. denied,* 50 N.J. 409, 235 A.2d 901 (1967).

*See also, Charles Bloom & Co. v. Echo Jewelers,* 279 N.J.Super. 372, 381, 652 A.2d 1238 (1995). Further, "[a]ny corporate officer, or director who participates by aid, instigation, or assistance in a conversion, is liable." *Id.* "A director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character, but, a director or officer who commits a tort, or who directs the tortious act to be done, or participates or cooperates therein, is liable to third persons injured thereby, even though liability may also attach to the corporations for the tort." *Id.,* at 381–382, 652 A.2d 1238. In addition, "[c]orporate officers are liable to persons injured by their own torts, even though they were acting on behalf of the corporation and their intent was to benefit the corporation." *Id.,* at 382, 652 A.2d 1238.

Appellants' first argument may be summarily disposed of given the *Bloom* court's language concerning the liability of corporate officers who engineer a conversion. Appellants' claim that the corporation exercised dominion over its own property to the exclusion of any such exercise by the BSL principals is farcical, in any event. The BSL principals clearly orchestrated the transfer of the assets and, thus, exercised "dominion" over the property.

Appellants' second argument—that the Banks' suffered no damage as a result of the transfer—is, to say the least, hotly contested. Appellees have submitted the McCarthy certification as evidence that they have been damaged, and that alone is enough to create a genuine dispute as to a material fact. Also hotly contested is appellants' claim that the Banks failed to object to the Stemcor transaction.

Summary judgment as to Count 4 was properly denied.

### 3. Count 5: Tortious Interference with Contractual Relations

 Under New York law, corporate officers may not be held personally liable for inducing the breach of a contract between their corporation and a third party so long as those acts are taken within the scope of their employment. *Application of Brookside Mills,* 276 A.D. 357, 94 N.Y.S.2d 509, 518 (1st Dep't 1950). Thus, to state a claim against a corporate officer, a plaintiff "must allege that the officers' or directors' 'acts were taken outside the scope of their employment or that they personally profited from their acts.'" *Courageous Syndicate, Inc. v. People–to–People Sports Committee, Inc.,* 141 A.D.2d 599, 529 N.Y.S.2d 520, 521 (A.D. 2d Dep't 1988) (quoting *Citicorp Retail Services v. Wellington Mercantile Services,* 90 A.D.2d 532, 455 N.Y.S.2d 98, 99–100 (A.D. 2d Dep't 1982)). In New Jersey, a corporate officer may be held personally liable for his own torts, including tortious interference with contractual relations, even when that officer is acting on behalf of the corporation and derives no personal benefit. *See Van Dam Egg Co. v. Allendale Farms, Inc.,* 199 N.J.Super. 452, 457, 489 A.2d 1209 (1985).

The *Van Dam Egg* court placed no limitation on the type of tort to which this general rule applies.

 The BSL principals moved to dismiss Count 5 arguing that under New York law they must have personally profited from their acts, and there is no allegation that they did so. Even had the issue of the application of New York law not been decided against them, as it has, the distinction between New York and New Jersey law is, in any event, irrelevant. Given that appellees allege that one aspect of the Stemcor transaction involved creating positions for the BSL principals at Stemcor with compensation being in part based on the profitability of the property transferred, appellees have stated a claim in which the corporate officers "personally profited by their acts". *See Courageous,* 529 N.Y.S.2d at 521. And, of course, under the New Jersey law applicable here, the BSL principals can be held personally liable for tortious interference even if they did not, in fact, benefit therefrom.

 Appellants also argue that Count 5 should have been dismissed because the complaint "is absolutely devoid of any allegation that BSL breached its contractual obligations to the Banks", *Appellants' Brief,* at 36. The BSL principals also moved for summary judgment on this count, arguing that "[t]he undisputed facts demonstrate that the defendants did not interfere with any existing contract ... [in that] BSL and the Banks received the highest possible value for the collateral." *Id.,* at 44.

This argument may be disposed of summarily, as appellees do by quoting the following passage from their complaint:

The defendants intentionally and unreasonably interfered with the contractual relationships with the Banks and BSL so as to impede BSL's ability to satisfy its contractual obligations to the Banks.

*Complaint,* ¶ 64. Moreover, as has been repeatedly stated, the McCarthy certification demonstrates that there are genuine issues of material fact concerning whether the debtor received fair market value for its assets.

The bankruptcy court correctly determined that the complaint sufficiently alleged tortious interference with contractual rela-

tions and that genuine issues of material fact remained such that the motion to dismiss and/or for summary judgment should be denied.

### 4. Count 6: Tortious Interference with Prospective Economic Advantage

■ The only argument advanced by appellants for dismissal of Count 6 is premised on the application of New York law which, it has been determined, will not be applied. More specifically, they argue that the BSL principals' actions were allegedly undertaken to advance their own competing business reasons and not purely for the purpose of harming the Banks, and, thus, under New York law the bankruptcy court should have dismissed Count 6. *Appellants' Brief,* at 38. This distinction, however, is irrelevant under New Jersey law where the only issue is whether the actions were done "intentionally and without justification". *Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 751, 563 A.2d 31 (1989). Clearly, the BSL principals cannot seriously argue that the acts were done unintentionally and, given appellees' claims of fraudulent conveyance and the claims set forth in the McCarthy certification, appellees have at least implicitly claimed that the actions were taken without justification.

■ Appellants' motion for summary judgment as to this count is again premised on the argument that there is no genuine issue as to whether the debtor received fair market value for its assets. *Appellants' Brief,* at 44. The McCarthy certification sufficiently demonstrates that genuine issues of fact as to the assets' value exist. The motion to dismiss and/or for summary judgment was properly denied.

### 5. Count 7: Conspiracy

■ Once again, the BSL principals' motion to dismiss is based on the application of New York law which, they assert, fails to recognize any tort for civil conspiracy. If New York law were to apply to this claim, appellants are correct in asserting that dismissal is appropriate because, under New York law, "no action for civil conspiracy is cognizable". *Smukler v. 12 Lofts Realty, Inc.,* 156 A.D.2d 161, 548 N.Y.S.2d 437, 439 (1

Dep't 1989). The bankruptcy court's conclusion to the contrary was wrong.

■ But New Jersey, not New York, law applies and under New Jersey law appellants have not even suggested a ground for dismissal, perhaps because appellees have clearly set forth the elements of their claim: (1) a combination of two or more persons—the Schnogs and Mr. Ouaknine; (2) a real agreement or confederation with a common design—the Stemcor transaction; and (3) the existence of an unlawful purpose or a purpose tainted with illegality—the alleged fraudulent transfer. *See Board of Education v. Hoek,* 66 N.J.Super. 231, 241, 168 A.2d 829 (1961), *rev'd in part on other grounds,* 38 N.J. 213, 183 A.2d 633 (1962).

Appellants argue only that summary judgment was appropriate on Count 7 because summary judgment or dismissal was appropriate on every other count. Since this is clearly not the case, summary judgment was properly denied.

### 6. Count 8: The Breach of the Duty of Loyalty

■ The parties agree that a corporate officer may not usurp a business opportunity for his or her own personal use if:

(a) the corporation is financially able to undertake it; (b) it is within the corporation's line of business; (c) the corporation is interested in the opportunity.

*Science Accessories Corp. v. Summagraphics Corp.,* 425 A.2d 957, 963 (Del.Super.1980) (citing *Guth v. Loft, Inc.,* 23 Del.Ch. 255, 5 A.2d 503 (Del.Super.1939)).

■ The BSL principals' argument in support of dismissal is threefold. First, they claim that BS Livingston was incapable of taking advantage of a business opportunity because "BSL was financially incapable of continuing in business." *Appellants' Brief,* at 40. Second, and somewhat contradictorily, they claim that they did not take this opportunity for themselves because the advantages of the Stemcor transaction inured to the benefit of the debtor. Third, they argue that, at a minimum, this claim can only be asserted by the Trustee because the Banks, as creditors, have no standing to

claim that they were owed a fiduciary duty by the BSL principals. *Id.*, at 40–41.

Whether BS Livingston was capable of undertaking a transaction akin to the Stemcor transaction (but without positions being allotted to the BSL principals) despite its tenuous financial condition is a factual question. Moreover, it seems highly dubious that the BSL principals could not have worked out a deal with Stemcor which would have produced a higher yield for the debtor in place of the profit-sharing positions the BSL principals received from and with Stemcor. Finally, the claim that B.S. Livingston was financially incapable of engaging in a similar deal because of its financial condition is dramatically undercut precisely because it *did* engage in the Stemcor transaction.

The BSL principals' second argument— that the Stemcor transaction provided the maximum return possible for the debtor— further undermines the first claim (and vice versa). Probing the contradictory nature of these two arguments is unnecessary, however, because it is clear that this second argument is hotly disputed. *See McCarthy Certification.* And, while the debtor certainly gained some benefit from the Stemcor transaction, the BSL principals cannot seriously argue that the transaction was not, in part, for their personal benefit.

Parenthetically, the BSL principals cite *In re Union Carbide Consumer Products Business Securities Litigation,* 666 F.Supp. 547, 568 (S.D.N.Y.1987), for the proposition that acceptance of employment with the purchaser of a portion of one's business "does not create a claim for breach of the duty of loyalty." *Appellants' Brief,* at 40. Whatever the merits of that case, the features that distinguish it from the present case are several—for example, it involved New York law, it involved "ordinary employees", and it did not implicate bankruptcy and the fiduciary duties owed to creditors.[21] Here, it is not merely the acceptance of employment that raises questions about the fairness of the Stemcor transaction but the additional provision dovetailing the profitability of Stemcor's BSL division with the compensation received by the Schnogs and Mr. Ouaknine. While this scenario may not ultimately result in a finding of a breach of the duty of loyalty, neither is such a finding precluded. Accordingly, the BSL principals' motion to dismiss and their motion for summary judgment should not have been granted on this ground.

Finally, the BSL principals' third argument is that even if a cause of action has been set forth by the Trustee, this claim should nonetheless have been dismissed insofar as it is brought by the Banks. This result, argue the BSL principals, follows from the rule that a director or officer of a corporation only owes fiduciary duties to the corporation and its shareholders and not to the corporation's creditors. *See Prudential–Bache v. Franz Mfg. Co.,* 531 A.2d 953, 955 (Del.Super.Ct.1987) ("Creditors' rights arise from contract and do not, by themselves, implicate the fiduciary duties officers owe their corporations and shareholders."). While the BSL principals correctly point out that officers and directors do not ordinarily owe a fiduciary duty to mere creditors, they conveniently ignore the fact that when "insolvency ... does arise, it creates fiduciary duties for directors for the benefit of creditors." *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.Ct.1992); *see also, Harff v. Kerkorian,* 324 A.2d 215, 222 (1974), *rev'd in part on other grounds,* 347 A.2d 133 (Del.Supr.1975). In addition, the Banks argue that the date of insolvency for the pur-

**21.** Similarly, in their Reply Brief, the BSL principals point to the wholly inapposite case of *Science Accessories v. Summagraphics,* 425 A.2d 957 (Del.Supr.1980), for the proposition that a court must balance the duty of a corporate employee to guard corporate secrets with the policy allowing free competition in the marketplace. In *Science Accessories,* two employees left their old corporation and formed a new corporation with several other persons, allegedly misappropriating trade secrets to a magnetostrictive digitizer. In neither *Science Accessories* nor *Union Carbide* did the employees who left the original corporation have the power to direct the sale of the corporation's assets to the new corporation which they joined. Nor did the employees receive compensation at the new corporation based upon the performance of the assets whose sale they had brought about. Finally, neither case implicated any fiduciary duties owed to creditors because bankruptcy was not at issue.

poses of establishing fiduciary duties owed to creditors is the date of insolvency in fact as opposed to the date that a bankruptcy petition is filed. *See Geyer,* 621 A.2d at 788 (citing *McDonald v. Williams,* 174 U.S. 397, 403, 19 S.Ct. 743, 745, 43 L.Ed. 1022 (1974)). In the following passage, the *Geyer* court unequivocally held that the date of insolvency in fact should prevail:

> Therefore, the issue the parties present to me is *when* do directors' fiduciary duties to creditors arise via insolvency. That is, I must decide whether insolvency arises so as to create a fiduciary duty to creditors when insolvency exists in fact or when a party institutes statutory proceedings (e.g. bankruptcy proceedings). Two factors lead me to conclude that insolvency means insolvency in fact rather than insolvency due to a statutory filing ... The first and most important factor is that Delaware caselaw requires this conclusion.... Besides Delaware caselaw, the other factor upon which I rely in holding that the insolvency exception arises upon the fact of insolvency.... is the ordinary meaning of the word insolvency.

621 A.2d at 787–789 (emphasis in original) (citing *Webster's Ninth New Collegiate Dictionary* 626 (1988)). The Banks rely as well upon the McCarthy certification which states that BS Livingston was insolvent as of September 1991, the time at which the Stemcor transaction was consummated. Thus, argue the Banks, there is at least a colorable claim that the BSL principals breached a fiduciary duty owed to the creditors at the time of the closing of the Stemcor transaction.

The BSL principals do not counter these contentions in any meaningful way in their Reply Brief. While they attempt to distinguish *Geyer* on its facts, they do not contest the existence of the insolvency exception, the fact that insolvency is to be measured from the date of insolvency in fact, or the date provided by the McCarthy certification for the onset of BS Livingston's insolvency, hardly surprising inasmuch as appellants argued in their opening brief that BS Livingston was "financially incapable of continuing in business" at the time of the Stemcor transaction. *See Appellants' Brief,* at 40.

Accordingly, the bankruptcy court's denial of the motion to dismiss and/or for summary judgment on Count 8 was correct.

### 7. The BSL Principals' Waiver, Estoppel and Laches Defenses

The BSL principals' final argument in support of summary judgment invokes the related grounds of waiver, estoppel and laches. Each of these defenses is premised on the same set of facts which can hardly be said to evidence the most compelling justification for the invocation of these legal doctrines. At a minimum, though, material facts remain in dispute foreclosing summary judgment.

Basically, the BSL principals claim that the Banks should be prohibited from objecting to the Stemcor transaction because (1) their refusal to make further loans to BS Livingston catapulted the debtor into insolvency; (2) they stood idly by during the ongoing negotiations between Stemcor and the BSL principals; and (3) the Banks immediately accepted the $800,000 that was produced by the Stemcor transaction. *Appellant's Brief,* at 45. Parenthetically, and although this court will resist the temptation to do more than note the obvious, a review of the September 28, 1993 Affidavit of Alfred Schnog reveals that the details of the Stemcor transaction—from the negotiation process to the objections voiced by the Banks—cast the basis for the defenses of waiver, estoppel and laches in an even more dubious light—even when described by Alfred Schnog himself.

Stated somewhat differently, and without even turning to the affidavits submitted by the Banks which contest many of Mr. Schnog's assertions, there is no real factual support for the defenses of waiver, estoppel or laches. Accordingly, the bankruptcy court correctly denied the BSL principals' motion for summary judgment based upon waiver, estoppel and laches.

### V. *CONCLUSION*

For the foregoing reasons, the June 21, 1994 order of the bankruptcy court is affirmed.